FILED
United States Court of Appeals
Tenth Circuit

**June 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

RIGOBERTO SANTILLAN QUIROZ,

    Petitioner - Appellant,

v.

MARKWAYNE MULLIN; TODD
BLANCHE; JOSHUA JOHNSON;
SCARLET GRANT,

    Respondents - Appellees.

----------------------------

IMMIGRATION LAW SCHOLARS;
ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK; THE
AMERICAN IMMIGRATION
LAWYERS ASSOCIATION; STATE
OF NEW YORK; STATE OF
CALIFORNIA; STATE OF
ARIZONA; STATE OF COLORADO;
STATE OF CONNECTICUT; STATE
OF DELAWARE; STATE OF
HAWAI'I; STATE OF ILLINOIS;
STATE OF MAINE; STATE OF
MARYLAND; STATE OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE
OF OREGON; STATE OF RHODE
ISLAND; STATE OF VERMONT;
STATE OF VIRGINIA; STATE OF

No. 26-6019

WASHINGTON; DISTRICT OF
COLUMBIA,

    Amici Curiae.

_____

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:25-CV-01349-PRW)**

_____

My Khanh Ngo of the American Civil Liberties Union Foundation, San Francisco, California (Michael K.T. Tan and Oscar Sarabia Roman of the American Civil Liberties Union Foundation, San Francisco, California; Judy Rabinovitz and Natalie Behr of the American Civil Liberties Union Foundation, New York, New York; Timothy R. Macdonald and Scott C. Medlock of the American Civil Liberties Union of Colorado Foundation, Denver, Colorado; Megan Lambert and Travis D. Handler of the American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, Oklahoma; and Kelli Stump of Kelli J. Stump, PLLC, Oklahoma City, Oklahoma, with her on the briefs), for Petitioner-Appellant.

Drew C. Ensign, Deputy Assistant Attorney General (Brett A. Shumate, Assistant Attorney General; Keith I. McManus, Assistant Director; Anthony J. Nardi, Trial Attorney, Office of Immigration Litigation, Civil Division, Department of Justice, on the brief), Washington, D.C., for Respondents-Appellees.

Amit Jain of the Roderick & Solange MacArthur Justice Center, Washington, D.C., filed an amicus curiae brief on behalf of Petitioner-Appellant, for Immigration Law Scholars.

Rebecca Cassler of the American Immigration Council, Washington, D.C., filed an amicus curiae brief on behalf of Petitioner-Appellant, for the Rocky Mountain Immigrant Advocacy Network and the American Immigration Lawyers Association.

Letitia James, Attorney General, and Gillian Barna, Assistant Solicitor General, State of New York, New York, New York, filed an amicus curiae brief on behalf of Petitioner-Appellant, for the State of New York, State of California, State of Arizona, State of Colorado, State of Connecticut, State of

Delaware, State of Hawai'i, State of Illinois, State of Maine, State of Maryland, State of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of Oregon, State of Rhode Island, State of Vermont, State of Virginia, State of Washington, and District of Columbia.

_____

Before **BACHARACH**, **EBEL**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

Petitioner Rigoberto Santillan Quiroz has been detained for more than eight consecutive months and counting. He is not charged with a crime. Nor does anyone suggest that he is a flight risk or a danger to the community. Rather, he is in pre-adjudicative detention[1] awaiting the outcome of his pending immigration removal proceedings. And because the Government recently interpreted immigration law to mandate his detention, Santillan Quiroz has not had the chance to argue for release at a bond hearing.

---

[1] The term "pre-adjudicative detention" is not often used to label the circumstances of immigration detainees pending removal proceedings even though it is perhaps most descriptively accurate. *See, e.g.*, Lindsay Nash, *Resurrecting Immigration Releases*, 135 Yale L.J. 1533, 1547 (2026) (discussing author's preference for "pre-adjudication detention"); *Kim v. Ziglar*, 276 F.3d 523, 533 (9th Cir. 2002) (also using "pre-adjudication civil detention"), *rev'd sub-nom.*, *Demore v. Kim*, 538 U.S. 510 (2003). For simplicity, we will refer to Santillan Quiroz's status and circumstances as detention.

His case is before this court on appeal from the denial of a petition for a writ of habeas corpus challenging his detention. Santillan Quiroz asks us to order the Government to release him or, alternatively, to provide him with a bond hearing to determine his suitability for release. The Government contests his petition, arguing that he is subject to mandatory detention and thus not entitled to release or a bond hearing.

The question before us is whether Santillan Quiroz is eligible for bond and therefore entitled to meaningfully challenge his detention at a bond hearing before an immigration judge. Answering this question will require the court to navigate several statutory provisions found in our Nation's immigration laws.

We are not the first circuit court of appeals this year to wrestle with this issue. That is because the Government did not take the position – that petitioners like Santillan Quiroz are ineligible for release and thus not entitled to a bond hearing – until July 2025, so its position stems from a new and novel reading of old statutes. The Government's new position has resulted in a large increase in the number of immigration detainees and a flood of habeas petitions challenging those detentions. The circuits have split on the best reading of the applicable statutes, and we are the latest court of appeals to weigh in on this question of national importance. Although the petition at issue presents a question of statutory

interpretation with nationwide implications, a habeas corpus petition is inherently personal. It is a challenge by one man, Santillan Quiroz, who remains detained by Immigration and Customs Enforcement (ICE).

The district court determined that Santillan Quiroz is not eligible for release or entitled to a bond hearing. We disagree and reverse.

**I**

Two decades ago, in 2006, Santillan Quiroz entered the United States. He has lived here ever since.

In that time, Santillan Quiroz started a family. He married a lawful permanent resident and became a father to a U.S.-citizen stepdaughter. He provided for them financially and stayed by his wife's side to offer care and support as she underwent treatment for a heart condition. Apart from one DUI for which he completed community service, he has no criminal history. By all accounts, Santillan Quiroz has become a valued and contributing member of his community.

On November 2, 2025, ICE agents whisked Santillan Quiroz away from his family. After detaining Santillan Quiroz at a traffic stop, the agents initiated removal proceedings against him on the basis that he entered the country without admission or parole. But they did not release Santillan Quiroz after the traffic stop concluded. Instead, they held him for several more days before eventually sending him to a detention center,

where he remains in custody to this day. According to the Government, Santillan Quiroz must remain in mandatory detention pursuant to 8 U.S.C. § 1225(b)(2)(A). Pointing to the same provision, the Government also claims that Santillan Quiroz is not entitled to a bond hearing and, as such, has not provided him with the opportunity to argue for release.

Santillan Quiroz filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. He asserted in his petition that the Government wrongly invoked § 1225(b)(2)(A) to detain him. Rather, Santillan Quiroz argued, his detention can only be authorized under 8 U.S.C. § 1226(a), and he is eligible for a bond hearing under that provision. A magistrate judge recommended granting Santillan Quiroz's petition. However, the district court rejected that recommendation and denied the petition. Santillan Quiroz timely appeals that denial.

## II

The Immigration and Nationality Act (INA) is "[t]he foundation of our laws on immigration and naturalization." *Kansas v. Garcia*, 589 U.S. 191, 195 (2020). Thirty years ago, Congress amended the INA when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009-546.

IIRIRA reformed the immigration removal system. Pre-IIRIRA, removal turned on *physical* entry. *Kawashima v. Holder*, 565 U.S. 478, 481

n.2 (2012). Noncitizens[2] who had been stopped at the border or ports of entry (border, for short) were placed in exclusion proceedings and removable on grounds of excludability. *Id.* Noncitizens who had entered the country, whether lawfully or not, were placed in deportation proceedings and removable on grounds of deportability. *Id.*

Post-IIRIRA, distinctions based on *lawful* entry replaced those based on physical entry. Specifically, IIRIRA introduced the term "admission," which it defined as "the lawful entry of the alien into the United States after inspection and authorization." 8 U.S.C. § 1101(a)(13)(A). Noncitizens who had entered the country unlawfully and therefore had not been admitted were subject to removal on grounds of inadmissibility. *Judulang v. Holder*, 565 U.S. 42, 46 (2011) (citing 8 U.S.C. § 1182(a)). Noncitizens who had entered lawfully and had been admitted remained subject to removal on grounds of deportability. *See* 8 U.S.C. § 1227(a). Finally, IIRIRA merged exclusion proceedings and deportation proceedings into a single set of removal proceedings. *Kawashima*, 565 U.S. at 481 n.2.

---

[2] The INA uses the word "alien," defined as "any person not a citizen or a national of the United States," instead of "noncitizen." 8 U.S.C. § 1101(a)(3). This opinion uses the term "noncitizen" to describe Santillan Quiroz and as an equivalent to "alien," unless "alien" appears within a quotation or is used as part of a statutory term of art.

In conjunction with these reforms, IIRIRA consolidated the Government's authority to detain noncitizens with pending removal proceedings into two provisions: § 1225 and § 1226. Of these two, § 1225 makes no mention of bond and instead mandates that noncitizens subject to its authority "shall be detained." 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV), (b)(2)(A). Meanwhile, § 1226 permits immigration officials to "release the alien on . . . bond" subject to some exceptions. 8 U.S.C. § 1226(a)(2)(A).

Soon after IIRIRA became law, the Government promulgated a regulation interpreting the relationship between § 1225 and § 1226. The regulation explained that "arriving aliens" (*i.e.*, those at the border) are subject to § 1225 and do not "have available to them bond redetermination hearings." 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). By contrast, "aliens who are present without having been admitted or paroled [*i.e.*, those already inside the United States] will be eligible for bond" under § 1226. *Id.* In simpler terms, the regulation said that § 1225 generally applies at the border while § 1226 applies in the country's interior.

Over the course of the next five Presidential administrations, that understanding held. But in July 2025, the Government reversed course. For the first time in IIRIRA's nearly thirty-year history, the Government took the position that § 1225, specifically subsection (b)(2)(A), applied to

noncitizens who had already entered the country without admission. Memorandum from Rodney S. Scott, Commissioner, U.S. Customs & Border Protection (July 10, 2025), https://perma.cc/C6SM-MXGS. Two months later, the Board of Immigration Appeals followed suit and agreed with the Government's new reading of the statute. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025).

These twin decisions – made within the executive branch – led to a wave of habeas petitions challenging the mandatory detention of unadmitted noncitizens based on the Government's newly minted interpretation. In the past few months, those petitions have begun to work their way into the circuit courts. So far, the Second, Sixth, and Eleventh Circuits have each held that § 1225(b)(2)(A) does not apply to unadmitted noncitizens who, like Santillan Quiroz, are found in the country's interior. *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Mia.*, 175 F.4th 1258 (11th Cir. 2026). The Fifth and Eighth Circuits have agreed with the Government that § 1225(b)(2)(A) applies. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026).

Every other numbered circuit has heard argument on the question. *Guerrero Orrellana v. Moniz*, Nos. 25-2152, 26-1094 (1st Cir.) (argued

May 4, 2026); *Buele Morocho v. Warden Phila. FDC*, Nos. 26-1150, 26-1454 (3d Cir.) (argued May 11, 2026); *Lopez Garcia v. Guadian*, Nos. 25-7044, 25-7050 (4th Cir.) (argued May 5, 2026); *Cirrus Rojas v. Olson*, No. 25-3127 (7th Cir.) (argued June 15, 2026);[3] *Rodriguez Vazquez v. Bostock*, No. 25-6842 (9th Cir.) (argued March 4, 2026). This court now adds its voice to the conversation on this important question of statutory interpretation.

## III

We have jurisdiction over Santillan Quiroz's appeal under 28 U.S.C. § 1291. Because he appeals from the denial of a § 2241 habeas petition, "we review legal questions de novo and factual findings for clear error." *Standifer v. Ledezma*, 653 F.3d 1276, 1278 (10th Cir. 2011). The sole issue we address in this appeal is whether § 1225(b)(2)(A) or § 1226(a) applies to Santillan Quiroz – a purely legal question of statutory interpretation – so our review is de novo. *Daley v. Ceja*, 158 F.4th 1152, 1156 (10th Cir. 2025).

## A

The court's task when interpreting a statute is to "give effect to the clear meaning of [that] statute[] as written." *Star Athletica, LLC v. Varsity*

---

[3] A prior Seventh Circuit panel previously deadlocked on this issue in the context of an appeal from the refusal to dissolve an immigration consent decree. *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828 (7th Cir. 2026).

*Brands, Inc.*, 580 U.S. 405, 414 (2017) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992)). Courts do so "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Often, this requires courts to dive into textual minutiae, parsing verb tense and the choice of one synonym over another. We will soon be doing just that. But before we get there, we first step back to appreciate the "broader context of the statute" and the baseline upon which we perform our statutory analysis.

A statute's broader context includes "the longstanding practice of the government." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks and citation omitted). Here, the Government's interpretation of nearly thirty years – that § 1225(b)(2)(A) applies at the border while § 1226(a) applies in the interior – qualifies as such a longstanding practice. *See* 62 Fed. Reg. at 10323. "[T]he fact that no President has ever found" § 1225(b)(2)(A) to mandate detention in the interior until now is "strong evidence that [such mandate] does not exist."[4]

---

[4] Citing 8 C.F.R. § 235.3(b)(1)(ii), the Fifth Circuit reasoned that the Government had previously extended § 1225(b)(2)(A) beyond the border. *Buenrostro-Mendez*, 166 F.4th at 507; *accord Hernandez Alvarez*, 175 F.4th at 1307 (Lagoa, J., dissenting). Not quite. Although this regulation references § 1225(b)(2)(A), it implements expedited removal under a

*Learning Res., Inc. v. Trump*, 607 U.S. 229, 250 (2026). Indeed, the Supreme Court has previously invoked this principle in the immigration context, rejecting an interpretation of a statutory subsection at odds with one that "every Presidential administration" had adopted in the then-26 years "[s]ince IIRIRA's enactment." *Biden v. Texas*, 597 U.S. 785, 805 (2022).

Resisting this idea, the Government suggested at oral argument that this history is merely unreasoned practice (as opposed to reasoned executive analysis) that grew out of "bureaucratic inertia." Oral Arg. at 39:00–39:45. Maybe so. But that characterization gives the Government no aid because it is precisely "Presidential *practice*" that matters. *Learning Res.*, 607 U.S. at 250 (emphasis added). So long as the executive branch issued an "interpretation . . . roughly contemporaneously with enactment of the statute" (check), and that interpretation "remained consistent over time" (check), we give the Government's longstanding interpretation weight in the analysis. *Loper Bright*, 603 U.S. at 386. The fact that this interpretation came in the form of an affirmative regulatory action, 62 Fed. Reg. at 10323, also refutes the Government's related argument that we are dealing with a

---

different subsection, § 1225(b)(1). So far as it extended detention into the interior, it did so only for noncitizens who satisfied the criteria in § 1225(b)(1)(A)(iii)(II), a subsection that does not apply to § 1225(b)(2)(A).

12

mere "lack of administrative exercise." *See* Resp. Br. at 52–53 (citing *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983)).

What's more, the Supreme Court has endorsed this (until recently) unbroken interpretation and practice. In *Jennings v. Rodriguez*, the Supreme Court explained that, for purposes of our immigration laws, § 1225 governs the processing of noncitizens at "the Nation's borders and ports of entry." 583 U.S. 281, 287 (2018). Once noncitizens are "inside the United States," § 1226 "generally governs the process of arresting and detaining that group of aliens pending their removal." *Id.* at 288. In short, *Jennings* explained that § 1225 "authorizes the Government to detain certain aliens seeking admission into the country" while § 1226 "authorizes the Government to detain certain aliens *already in the country*." *Id.* at 289 (emphasis added).[5] We therefore approach the Government's novel, contrary position with a healthy dose of skepticism.

_____

[5] *Jennings*'s description of the interplay between § 1225 and § 1226 is obiter dictum. Still, we are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1228 n.11 (10th Cir. 2021) (quoting *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007)). *Jennings* therefore counsels, if not requires, us to rule in Santillan Quiroz's favor since immigration agents did not arrest Santillan Quiroz at the border. The Government objects that *Jennings* is ambiguous on whether § 1225 is restricted to the border. But we need not linger on the meaning of *Jennings*'s dicta. In light of the importance of the issues raised in this appeal, we conduct a full statutory

With that baseline established, we proceed with a statutory analysis. We first analyze the text of the specific provision invoked to detain Santillan Quiroz, § 1225(b)(2)(A), including how that provision fits into § 1225 as a whole. We then discuss how § 1225(b)(2)(A) interacts with § 1226(a) before considering and rejecting the Government's statutory purpose arguments. Finally, we explain how and why constitutional avoidance applies here. We hold that noncitizens who entered the United States and were thereafter detained in the interior of the country are usually subject to § 1226(a) (and thus eligible for bond), not § 1225(b)(2)(A).[6]

**B**

"We begin, as always, with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172 (2001). Here, that language reads in relevant part:

> [I]n the case of an alien who is an **applicant for admission**, if the examining immigration officer determines that an alien **seeking admission** is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding[.]

8 U.S.C. § 1225(b)(2)(A) (emphases added).

---

analysis as if *Jennings*'s dicta were nonbinding, and we ultimately reach the same result.

[6] Some noncitizens who are arrested in the interior may be subject to § 1225(b)(1)(A). There is no argument here that § 1225(b)(1)(A) applies to Santillan Quiroz.

The outcome of this appeal turns on how § 1225(b)(2)(A) uses the terms "applicant for admission" and "seeking admission." According to Santillan Quiroz, each of the two terms are independent restrictions on § 1225(b)(2)(A)'s scope. He concedes that he is an applicant for admission but contends that he is not seeking admission. So, from his perspective, § 1225(b)(2)(A) does not apply to him or noncitizens like him. On the other hand, the Government argues that "seeking admission" has no independent force separate from "applicant for admission." From its vantage point, § 1225(b)(2)(A) applies to all applicants for admission, including Santillan Quiroz and other unadmitted noncitizens arrested in the country's interior.

**1**

Two mirror image principles guide our interpretation of "applicant for admission" and "seeking admission." First, "[w]hen a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Second, "[w]hen 'a statute includes an explicit definition' of a term, 'we must follow that definition[] even if it varies from a term's ordinary meaning.'" *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (quoting *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020)); *accord Feliciano v. Dep't of Transp.*, 605 U.S. 38, 50 n.4 (2025).

"Applicant for admission" is a defined term. Accordingly, we eschew its ordinary meaning in favor of its statutory definition: "An alien present

15

in the United States who has not been admitted or who arrives in the United States[.]" 8 U.S.C. § 1225(a)(1).

By contrast, "seeking admission" is only partially defined. Congress defined "admission" to mean lawful entry following inspection, but it said nothing about what it means to be "seeking" something. 8 U.S.C. § 1101(a)(13)(A). This tells us "seeking admission" is equivalent to "seeking lawful entry" and leaves us to define "seeking" according to that word's ordinary meaning.

To determine the ordinary meaning of "seek," we consult contemporary dictionaries. *See M.S. v. Premera Blue Cross*, 118 F.4th 1248, 1266 (10th Cir. 2024). Here, our sister circuits have already done the legwork by canvassing such dictionaries, and we agree with them that "seek" ordinarily means "request," "ask for," or something similar. *Barbosa da Cunha*, 175 F.4th at 74; *accord Lopez-Campos*, 175 F.4th at 722–23; *Avila*, 170 F.4th at 1134; *Buenrostro-Mendez*, 166 F.4th at 502. Of course, § 1225(b)(2)(A) does not use the verb "seek" but rather the present participle "seeking." The choice of present participle adds another layer to our interpretation because it requires present and continuing action. *See, e.g.*, *D.L. Markham DDS, MSD, Inc. 401(K) Plan v. Variable Annuity Life Ins. Co.*, 88 F.4th 602, 610 (5th Cir. 2023); *United States v. Stewart*, 73 F.4th 423, 425 (6th Cir. 2023); *Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*,

16

48 F.4th 1298, 1307 (11th Cir. 2022); *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019).

Putting these pieces together, we conclude that a noncitizen is "seeking admission" when he takes some kind of ongoing action to request lawful entry into the United States. To be clear, we do not construe "seeking admission" as limited to the literal moments that a noncitizen is filling out a form or speaking with an immigration official to request admission. *See Buenrostro-Mendez*, 166 F.4th at 502; *Avila*, 170 F.4th at 1134. It is enough that some pending request for admission remains open or ongoing because that indicates the process of securing admission is still active. *See Khakhn v. Holder*, 371 F. App'x 933, 937 (10th Cir. 2010)[7] (suggesting that under our immigration laws, a person is "'applying' for adjustment of status" until "his application [is] denied").

With these constructions of "applicant for admission" and "seeking admission" in hand, it becomes apparent why § 1225(b)(2)(A) does not apply to Santillan Quiroz. By statutory definition, Santillan Quiroz is an applicant for admission because he is present in the United States without

---

[7] We cite unpublished decisions for their persuasive value only and do not treat them as binding precedent. 10th Cir. R. 32.1(A).

having been admitted. *See* 8 U.S.C. § 1225(a)(1). However, he is not seeking admission since he has no present request for lawful entry pending.

The fact that Santillan Quiroz is not seeking admission is more than mere happenstance. Noncitizens in Santillan Quiroz's position – that is, those who entered the United States without admission and who have lived here since – are categorically unable to seek admission while they remain in the country. Part of the reason is a matter of logic and common sense. A person cannot make a present request for permission to enter the United States, lawfully or otherwise, once he or she has already entered.

The other reason this is true relates to the structure of our immigration laws. A noncitizen can request legal status even after he has entered the United States unlawfully, but he cannot request admission after the fact. That is because "[l]awful status and admission . . . are distinct concepts in immigration law." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). Lawful status allows a noncitizen "to remain in the country." *Id.* at 416. Admission, though, is defined in terms of "*entry into* the United States, denoting by its plain terms passage into the country from abroad." *Medina-Rosales v. Holder*, 778 F.3d 1140, 1145 (10th Cir. 2015) (emphasis in original) (quoting *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1051 (9th Cir. 2014)). The concept of admission "does not encompass a *post-entry* adjustment of status" because such adjustment does not involve "passage

into the country from abroad." *Id.* (emphasis added) (citation omitted); *accord Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008). So, for instance, a noncitizen who entered the country unlawfully, but who later receives temporary protected status or asylum, does not become admitted even though he has lawful status. *Sanchez*, 593 U.S. at 415.

The upshot is that once a noncitizen has entered unlawfully, no amount of legal maneuvering allows him to go back in time and make his initial entry lawful. The only time a noncitizen can be said to be seeking admission is when he is seeking to enter the United States at the border.[8] Since § 1225(b)(2)(A) applies only to those seeking admission, § 1225(b)(2)(A) is likewise limited to the border.

This border-oriented result tracks with the larger context of § 1225, starting with the section's title: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing."

---

[8] Our dissenting colleague on the Sixth Circuit observes that "the law sometimes treats present immigrants as 'seeking admission' even after an illegal entry." *Lopez-Campos*, 175 F.4th at 752 (Murphy, J., dissenting). That's true as far as it goes. Under 8 U.S.C. § 1101(a)(13)(C), some lawful permanent residents are regarded as seeking admission even after entering the country. But § 1101(a)(13)(C) is a specific statutory carveout that applies only to lawful permanent residents. It does not apply to noncitizens like Santillan Quiroz who never had lawful permanent resident status and therefore does not displace the ordinary meaning of "seeking admission" as applied to Santillan Quiroz.

8 U.S.C. § 1225. While a title does not control over the text, it can helpfully "reinforce[] what the text's nouns and verbs independently suggest." *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (quoting *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring in the judgment)). Such is the case here.

For starters, § 1225's title refers to "[i]nspection by immigration officers." When Congress enacted IIRIRA in 1996, immigration inspections took place at the border. *See Barbosa da Cunha*, 175 F.4th at 98 & n.12 (Cabranes, J., concurring) (collecting cases). Immigration officials were statutorily required to conduct inspections at ports of entry. 8 U.S.C. § 1225(a) (1995). And noncitizens were required to undergo inspection when making entry at the border or else face deportation or criminal charges. 8 U.S.C. § 1251(a)(1)(B) (1995) (deportable offense); *id.* § 1325(a) (1995) (criminal offense). The title's reference to inspections, then, hints that § 1225 focuses on the border. So too does the title's reference to "arriving aliens"; a noncitizen arrives in the country when he or she crosses the border.

Additional border-related language abounds in the body of § 1225. Subsections (a)(2), (b)(1)(A)(i) & (ii), (b)(1)(F), (b)(2)(C), (c)(1), and (d)(2)(A) all speak of noncitizens who are "arriving" or who "arrive[]." Further, subsections (d)(1) and (d)(2) authorize immigration agents to search

vehicles that are "bringing" noncitizens, or in which noncitizens are "being brought," into the country. Again, all that happens at the border.

Only a single provision within § 1225, subsection (b)(1)(A)(iii)(II), mentions or refers to noncitizens in the country's interior. Unlike that provision, § 1225(b)(2)(A) does not include language that references noncitizens who are present in the interior. "When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022) (citation modified). So, Congress's omission of any reference to the interior in § 1225(b)(2)(A) is evidence that the subsection does not apply to the interior.

That said, § 1225(b)(2)(A) also lacks the express reference to arriving noncitizens that limits many other provisions of § 1225 to the border. And one could argue that *this* omission implies § 1225(b)(2)(A) is not limited to the border. *See Castañon-Nava*, 175 F.4th at 875 (Kirsch, J., dissenting). What to do with these competing omissions? The answer is that "[t]he force of any negative implication [] depends on context." *Parrish v. United States*, 605 U.S. 376, 389 (2025) (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017)). Given that so many of § 1225's provisions focus on arrival at the border while there is only a single outlier that applies to the interior, the best way to interpret subsection (b)(2)(A)'s dual omissions in context is to

treat subsection (b)(2)(A) like the majority of the other provisions in § 1225 by limiting it to the border. In the absence of express indication otherwise, we apply the rule and not the exception.

Based on the statutory text and context, we conclude that § 1225(b)(2)(A)'s application is limited to the border.

## 2

Pushing back against this reasoning, the Government offers several textual arguments in an effort to persuade us that its reading and interpretation of § 1225(b)(2)(A) must prevail. We are not convinced.

The Government's core position is that "applicant for admission," but not "seeking admission," limits § 1225(b)(2)(A)'s scope. Which is to say, the Government openly asks us to read the phrase "seeking admission" out of the statute. Since only "applicant for admission" has any force in the Government's view, Congress could have more simply drafted § 1225(b)(2)(A) to apply "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that [such] alien ~~seeking admission~~ is not clearly and beyond a doubt entitled to be admitted." *Cf.* 8 U.S.C. § 1225(b)(2)(A).

The Government's reading runs afoul of the so-called canon against surplusage, or the idea that courts should "'give effect, if possible, to every clause and word of a statute'" since it is "presum[ed] that each word

22

Congress uses is there for a reason." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477–78 (2017) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). It also runs afoul of the related canon that when Congress "uses certain language in one part of the statute ['applicant for admission'] and different language in another ['seeking admission'])," we presume "different meanings were intended." *DePierre v. United States*, 564 U.S. 70, 83 (2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)).

To be sure, these canons are not ironclad rules. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). "Sometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). And interpreting different language "to mean roughly the same thing" is not categorically "forbid[den]." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013). However, these canons put a thumb on the scale in favor of giving "seeking admission" independent effect, and it is up to the Government to convince us that its redundant interpretation is the "more natural one." *Stanley v. City of Sanford*, 606 U.S. 46, 56 (2025) (citation omitted).

The crux of the Government's argument is this: An applicant for admission is, by definition, someone who is applying for admission. Because applying for something is a form of seeking that thing, it follows that an

applicant for admission is seeking admission. To drive this point home, the Government borrows an analogy to college applications from the Fifth and Eighth Circuits. *Buenrostro-Mendez*, 166 F.4th at 502; *Avila*, 170 F.4th at 1134. A college applicant, says the Government, must be applying to that college and therefore must also be seeking admission there.

On the surface, this argument seems logical. But that surface appeal is the product of an interpretive sleight of hand. In drawing its analogy to the college admissions process, the Government relies on "[t]he everyday meaning" of "applicant for admission." *Buenrostro-Mendez*, 166 F.4th at 502; *accord Avila*, 170 F.4th at 1134 (using the "ordinary meaning" of the term). IIRIRA, however, statutorily defines the term "applicant for admission" as someone who is present in the United States without admission or who is arriving in the United States. 8 U.S.C. § 1225(a)(1). This "statutory definition . . . excludes unstated meanings of that term." *Meese v. Keene*, 481 U.S. 465, 484–85 (1987). We must therefore construe "applicant for admission" as "*[IIRIRA] defines that phrase*," not according to the phrase's ordinary meaning. *Van Buren*, 593 U.S. at 387–88 (emphasis in original).

The Government does not do so. Instead, it conflates ordinary and statutory meaning. *See Lopez-Campos*, 175 F.4th at 727–28; *Hernandez Alvarez*, 175 F.4th at 1267; *Barbosa da Cunha*, 175 F.4th at 75–76. When

determining whether Santillan Quiroz is an applicant for admission, the Government applies the statutory meaning because Santillan Quiroz would not be an applicant for admission under the term's ordinary meaning – he is not applying for anything. But when arguing that "seeking admission" has no independent effect, the Government abandons that statutory meaning in favor of the ordinary one. Like Schrödinger's cat is simultaneously dead and alive, "applicant for admission" simultaneously takes on both its ordinary and statutory meanings in the Government's hands.

As far as we are aware, no other phrase in the United States Code has this Schrödinger-esque property. Given that point, one would expect the Government to have an exceedingly persuasive argument to justify its interpretive quantum leap. Yet the Government glosses over this complication in its brief. The Fifth and Eighth Circuits similarly paid scant attention to the problem in their opinions adopting the Government's position. *Buenrostro-Mendez*, 166 F.4th at 502–03; *Avila*, 170 F.4th at 1134–35. The most robust defense of this approach instead comes from our dissenting colleagues on the Sixth and Eleventh Circuits, which the Government briefly alluded to during oral argument.

Ordinarily, "[w]e do not consider arguments raised for the first time at oral argument." *United States v. Anthony*, 22 F.4th 943, 952 (10th Cir.

2022). The circumstances here are unique, though. We are construing a statute, and that construction will apply to everyone in this circuit, not just the immediate parties to this appeal. As the statutory construction issue "is properly before the court," we are "not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Indeed, we would be remiss to overlook material interpretive arguments just because an immediate party did not raise them; doing so would run the risk of locking in an erroneous interpretation. That is especially true here because, as mentioned, every circuit has now heard argument on the same question, and each opinion issued thereafter merits consideration by the courts where the question remains pending. The particularly weighty nature of the interpretive question here counsels in favor of a fulsome and thorough analysis.

All this is to say that we will consider the justifications for mandatory detention set forth in the Sixth and Eleventh Circuit dissents. In doing so, we respectfully disagree with their reasoning. Their view is that IIRIRA never actually defines "applicant for admission" because it uses the word "deemed" when describing applicants for admission in § 1225(a)(1). *Lopez-Campos*, 175 F.4th at 743 (Murphy, J., dissenting); *Hernandez*

26

*Alvarez*, 175 F.4th at 1287–89 (Lagoa, J., dissenting). The choice of "deemed," as opposed to a word like "means" or "defined," purportedly renders § 1225(a)(1) a "legal fiction" rather than a definition. According to our dissenting colleagues, the legal fiction that 'a person is deemed to be A' also deems that person to have all of A's ordinary attributes and meanings. *See Hernandez Alvarez*, 175 F.4th at 1289 (Lagoa, J., dissenting). So, when § 1225(a)(1) deems certain noncitizens to be applicants for admission, it also deems them to be seeking admission.

The word "deemed" cannot bear the weight of the millions of noncitizens it would potentially subject to detention without bond. For one, this construction would render the word "deemed" a mousehole hiding an elephant. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). "Deemed" is a single word, tucked away in a definitional provision that says nothing on its face about detention. *See* 8 U.S.C. § 1225(a)(1). Yet that one word supposedly upends the country's system of immigration detention by mandating the bondless detention of millions. Congress does not rely on such "subtle device[s]" to make changes of "enormous importance." *Biden v. Nebraska*, 600 U.S. 477, 518 (2023) (Barrett, J., concurring) (quoting *MCI Telecomm'cns Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994)).

The deeming argument fails substantively, too. It is based on the false premise that only words like "means" and "defined" can create a statutory

definition. While "means" or "defined" may be the clearest ways to signal that a provision is definitional, they are not the only ways to do so. Other phrases like "referred to as" also constitute "quintessential definitional language." *Pereira v. Sessions*, 585 U.S. 198, 213 (2018). So long as a statutory provision specifically directs how to construe or understand the meaning of a particular phrase, that provision is definitional.

Measured against this benchmark, "deemed" is definitional. We know this because the Supreme Court has told us so. In *TC Heartland LLC v. Kraft Foods Group Brands LLC*, the Supreme Court analyzed 28 U.S.C. § 1391(c), which described a corporation's residence for purposes of venue. 581 U.S. 258, 262 (2017). Section 1391(c) uses the word "deemed": A corporation "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Even though the section did not use "means" or "defined," the Supreme Court thought it clear that § 1391(c) contained a "*definition* of corporate 'residence.'" *TC Heartland*, 581 U.S. at 262 (emphasis added). For good reason, too, as a

search of the United States Code shows that Congress frequently uses the word "deemed" in definition sections.[9]

Section 1225(a)(1) is even more clearly definitional than the venue provision in *TC Heartland*. While that venue provision generally described the concept of residence, § 1225(a)(1) tells us how to interpret a particular phrase, "applicant for admission." The fact that § 1225(a)(1) is about a particular term of art also distinguishes it from the three examples of legal fictions cited in the Eleventh Circuit dissent. *Hernandez Alvarez*, 175 F.4th at 1288–90 (Lagoa, J., dissenting). Only one of those examples, *Sturgeon v. Frost*, involved a deeming clause. 587 U.S. 28, 47 (2019) (citing 16 U.S.C. § 3103(c)). But that deeming clause was clearly not a definition because it did not purport to give meaning to a particular term of art. *See* 16 U.S.C. § 3103(c). The remaining two examples did not interpret statutory deeming provisions at all. *Leng May Ma v. Barber*, 357 U.S. 185 (1958); *Kaplan v.*

---

[9] *E.g.*, 15 U.S.C. § 769 ("(1) any reference to 'function' or 'functions' shall be **deemed** to include . . ."; etc.); 22 U.S.C. § 3602(b) ("'Canal Zone' shall be **deemed** to refer to . . ."; etc.); 26 U.S.C. § 7701(a)(51)(E)(ii) & (iii) ("such entity shall be **deemed** to be a foreign-controlled entity"; etc.); 33 U.S.C. § 1107 ("the term 'marine science' shall be **deemed** to apply to . . ."; etc.); 46 U.S.C. § 12101(a) ("In this chapter, a vessel is **deemed** to have been rebuilt in the United States only if . . ."); 50 U.S.C. § 3814(b)–(f) ("The term 'United States', when used in a geographical sense, shall be **deemed** to mean . . ."; etc.) (all emphases added).

29

*Tod*, 267 U.S. 228 (1925). It is therefore best to understand § 1225(a)(1)'s use of the word "deemed" as creating a definition, not a legal fiction.

Even if § 1225(a)(1) created a legal fiction, we are not so sure that legal fictions behave in the way our colleagues posit. Courts interpreting a statute "will not attribute words to Congress that it has not written." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009). When Congress deems a person as 'A' but remains silent about whether that person is also deemed as 'B,' we should not infer that Congress meant to deem the person as 'B,' too. That is true even if 'A' and 'B' are related in their ordinary usage, like "applicant for admission" and "seeking admission" may be. *See Torres v. Barr*, 976 F.3d 918, 928–29 (9th Cir. 2020) (en banc) (when § 1225(a)(1) deems a noncitizen to be an "applicant for admission," it does not also deem that noncitizen to have made "an actual application for admission"). "[W]e will not speculate that Congress meant what it did not say," so we interpret § 1225(a)(1) to deem noncitizens as applicants for admission only, not to also deem them as seeking admission. *Tank v. Chronister*, 160 F.3d 597, 600 (10th Cir. 1998).

In sum, the "deemed" argument advanced by the Sixth and Eleventh Circuit dissents does not justify the Government's position.[10] That leaves the Government's contextual arguments, which fare no better than its textual ones.

**3**

The Government makes five contextual arguments that we now address in turn. *First*, the Government directs us to § 1225(a)(3), which

---

[10] We briefly address two other points raised in these dissents. The Sixth Circuit dissent asserts that the Government's interpretation does not actually render "seeking admission" superfluous. *Lopez-Campos*, 175 F.4th at 742 (Murphy, J., dissenting). The dissent believes that "seeking admission" does independent work because it excludes from § 1225(b)(2)(A)'s ambit all noncitizens who "withdraw" their applications. *Id.* That is not how the Government's interpretation works. The Government's interpretation treats noncitizens as seeking admission solely based on their status as applicants for admission, not on any action that they do or do not take. And to the extent that the dissent would treat a noncitizen as "constructive[ly]" seeking admission by entering the country and "withdraw[ing]" that application by departing, it would create surplusage in *yet another* subsection of the statute. *See id.*; 8 U.S.C. § 1225(a)(4) (treating withdrawal and departure as separate events).

The Eleventh Circuit dissent refers to "applicant for admission" and "seeking admission" as a doublet to which the surplusage canon does not apply. *Hernandez Alvarez*, 175 F.4th at 1295–96 (Lagoa, J., dissenting). But the dissent does not explain what makes something a doublet other than a court's say-so. In any event, recognized doublets include phrases like "cease and desist" or "free and clear." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 646 (7th Cir. 2007). "Applicant for admission" and "seeking admission," which appear in completely different clauses of § 1225(b)(2)(A), do not resemble a doublet.

31

requires immigration officers to inspect "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission." 8 U.S.C. § 1225(a)(3). It contends that the use of "or otherwise" to link "applicants for admission" with "seeking admission" shows that applicants for admission are a subset of those seeking admission. And so, the Government asserts, applicants for admission must be seeking admission.

We agree that "or otherwise" can indicate a subset-superset relationship. *See Barbosa da Cunha*, 175 F.4th at 78–79. But the phrase does not *always* establish such a relationship. "Or otherwise" can also simply refer to something different. *Id.*

It is easy to find examples where "or otherwise" does not have the Government's preferred meaning. In *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, the Supreme Court construed the phrase "in public use, on sale, *or otherwise* available to the public." 586 U.S. 123, 125 (2019) (emphasis added) (quoting 35 U.S.C. § 102(a)(1)). One party claimed that the statute's use of "or otherwise" must make "on sale" a subset of "available to the public" such that private sales were not included. *Id.* at 132. The Supreme Court rejected this subset argument and held that private sales did fall under the statute. *Id.*

Similarly, immigration law defines "falsely make" as submitting a document that "contains a false, fictitious, or fraudulent statement or

32

material representation . . . *or otherwise* fails to state a fact which is material." 8 U.S.C. § 1324c(f) (emphasis added). Put differently, a person "falsely makes" when submitting an affirmative misrepresentation "or otherwise" omitting a material fact. However, affirmatively saying something false is different from, not a subset of, failing to say a fact.

The bottom line is that the meaning of "or otherwise" in a statute is context dependent. Yet nothing in § 1225(a)(3) disambiguates between the Government's preferred subset-superset meaning and the simpler "something different" meaning. Without that disambiguation, § 1225(a)(3) does not compel the conclusion that all applicants for admission are necessarily seeking admission. Thus, § 1225(a)(3)'s "or otherwise" language does not turn the argument in the Government's favor.

***Second***, the Government cites § 1225(a)(5), which provides that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States." 8 U.S.C. § 1225(a)(5). If applicants for admission can be asked questions when they seek admission, this shows that applicants for admission are seeking admission. Or at least, so the Government asserts.

However, that conclusion does not follow from either § 1225(a)(5)'s grammatical or logical structure. All that subsection (a)(5) demonstrates is

that applicants for admission *can* be seeking admission, not that they must be. A counterexample makes this apparent: "A person may be asked to provide any allergy information to his server in ordering food at a restaurant." This sentence has the same grammatical and logical structure as § 1225(a)(5). It does not mean, though, that all persons are necessarily ordering food at a restaurant. Rather, it means that if persons happen to order food at a restaurant, they may be asked to provide allergy information to their server.

***Third***, the Government claims that limiting § 1225(b)(2)(A) to the border would create its own surplusage by making that section duplicative of § 1225(b)(1), which is also limited to the border. But subsection (b)(1) serves an important function at the border that subsection (b)(2)(A) does not. Subsection (b)(1) funnels a subset of noncitizens encountered at the border (those inadmissible under 8 U.S.C. §§ 1182(a)(6)(C) and 1182(a)(7)) into expedited removal proceedings through which they can be removed "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i); *accord* 8 C.F.R. § 235.3. By contrast, subsection (b)(2)(A) is the catchall for noncitizens at the border who are not subject to expedited removal (those inadmissible on grounds other than the two identified above) and provides that those noncitizens will receive full removal proceedings "under section 1229a." 8 U.S.C. § 1225(b)(2)(A).

*Fourth*, the Government asserts that Santillan Quiroz's interpretation of "seeking admission" nullifies the definition of "applicant for admission." According to the Government, this is because "applicant for admission" is defined to include noncitizens in the interior, but every time the phrase appears in the statute, "seeking admission" excludes such noncitizens. *See Buenrostro-Mendez*, 166 F.4th at 504. So, half of the definition of "applicant for admission" does no work. That is incorrect.

The only time "seeking admission" limits "applicant for admission" is in § 1225(b)(2)(A). Although "seeking admission" appears together with "applicant for admission" in § 1225(a)(3), the two phrases appear in the disjunctive, meaning that one does not limit the other. "Applicant for admission" therefore takes on its full scope in § 1225(a)(3). Additionally, the definition of "applicant for admission" is not restricted to § 1225. The definition applies "for purposes of [the entire] chapter," *i.e.*, the entire INA. 8 U.S.C. § 1225(a)(1). And elsewhere, the INA sets standards of proof for removal proceedings based on whether a noncitizen is an applicant for admission or not. 8 U.S.C. § 1229a(c)(2). In that section, the phrase "seeking admission" does not even appear and therefore cannot conflict with "applicant for admission."

Thus, the structure of our immigration laws is rational. Congress imposed a broad definition of "applicant for admission" to be used

35

throughout our immigration laws. It then narrowed the term's scope in § 1225(b)(2)(A) specifically.

*Fifth*, and finally, the Government suggests that adopting Santillan Quiroz's interpretation will create difficult line-drawing questions on how to apply § 1225(b)(2)(A) in practice. How far from the border, and how soon upon crossing the border, must a noncitizen be detained such that § 1225(b)(2)(A) applies? Those questions may well pose challenges in individual cases. But the existence of line-drawing challenges is unremarkable. "[T]he constant business of the law is to draw such lines," *Dominion Hotel v. Arizona*, 249 U.S. 265, 269 (1919), and "the law is full of instances" that "depend[] on . . . some matter of degree." *Cf. Johnson v. United States*, 576 U.S. 591, 604 (2015) (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)). Courts cannot rewrite a statute's plain terms just to avoid hard cases.

In all, the Government's textual and contextual[11] arguments don't move the needle. Nothing about those arguments convinces us to depart

---

[11] In appeals before other circuits, the Government has pointed to supposed tension between our interpretation of "seeking admission" and a similar phrase in the INA's humanitarian parole provision, "applying for admission." 8 U.S.C. § 1182(d)(5)(A). Suffice to say that whatever tension might exist in other circuits' caselaw, it does not exist here because neither this court nor the Supreme Court have previously construed "applying for admission" inconsistently with "seeking admission."

from our conclusion that § 1225(b)(2)(A) is limited to the border, and that Santillan Quiroz is an "applicant for admission" but not "seeking admission."

C

Reading § 1225(b)(2)(A) together with § 1226(a) also supports the conclusion that § 1225(b)(2)(A) is restricted to the border. Recall that § 1226(a) provides another source of detention authority pending removal proceedings. As we will explain, that detention authority includes at least some inadmissible noncitizens within its scope. The Government's interpretation, however, would remove *all* inadmissible noncitizens from § 1226(a)'s scope.

To see why § 1226(a) must apply to at least some inadmissible noncitizens, we start with its text. Section 1226(a) authorizes the Government to detain a noncitizen "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Removal proceedings cover those who are inadmissible, which in turn suggests that § 1226(a) authorizes the detention of inadmissible noncitizens. *See Kawashima*, 565 U.S. at 481 n.2. Section 1226(c) confirms this. As noted earlier, noncitizens detained under § 1226(a) are generally eligible for bond. 8 U.S.C. § 1226(a)(2). But § 1226(c) creates exceptions to that general rule, including specific exceptions for inadmissible noncitizens. 8 U.S.C.

37

§§ 1226(c)(1)(A), (D), (E). There would be no need for § 1226(c) to provide such exceptions unless § 1226(a) applied to at least some inadmissible noncitizens.

The Government's interpretation disrupts § 1226(a)'s coverage of inadmissible noncitizens. If the Government is correct that § 1225(b)(2)(A) mandates the detention of all applicants for admission, then there are no inadmissible noncitizens left for § 1226(a) to cover. *See* 8 U.S.C. § 1225(a)(1) (applicants for admission are unadmitted and/or arriving); *Judulang*, 565 U.S. at 46 (grounds of inadmissibility apply to those who are unadmitted or arriving). Consequently, the subsections of § 1226(c) addressing inadmissible aliens would be rendered useless since there would be no inadmissible aliens to except from bond eligibility under § 1226(a). This creates a surplusage problem, and a big one, because the surplusage canon "applies with special force" when an interpretation would render "'entire subparagraph[s] meaningless.'" *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (quoting *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 583 U.S. 109, 128 (2018)).

The Government answers this problem by asserting that § 1226(c) is a standalone limitation on the release of noncitizens being held in detention. Thus, it says, those parts of § 1226(c) that refer to inadmissible aliens still have an effect on other detention authorities, just not on

§ 1226(a). The problem with this argument is that the Supreme Court has squarely rejected the interpretation of § 1226(c) "as establishing [a] separate source[] of arrest and release authority" apart from § 1226(a). *Nielsen v. Preap*, 586 U.S. 392, 409 (2019). To the contrary, the Court held that § 1226(c) "is simply a limit on the authority conferred by" § 1226(a). *Id.* This makes good sense, as § 1226(c) lacks language indicating Congress intended for it to apply beyond the confines of § 1226. Language that, we add, Congress readily used elsewhere in our immigration laws. *See, e.g.*, 8 U.S.C. § 1225(a)(1) ("for purposes of this chapter"); 8 U.S.C. § 1101(a) ("As used in this chapter"); 8 U.S.C. § 1101(h) ("For purposes of section 1182(a)(2)(E) of this title").

The Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025), only reinforces this conclusion. Congress passed the Act last year on January 29, 2025. *Id.* At the time of the Act's passage, the Government had not yet adopted its current view that § 1225(b)(2)(A) applies to the interior; its longstanding and nearly thirty-year-old interpretation – that § 1225(b)(2)(A) was limited to the border – still stood. Against that backdrop, the Laken Riley Act did not extend § 1225(b)(2)(A)'s bondless detention mandate to the country's interior. Rather, the Act added a new exception to § 1226(c), one that specifically prohibited certain inadmissible

39

noncitizens from seeking a bond. Laken Riley Act § 2 (codified at 8 U.S.C. § 1226(c)(1)(E)).

"When Congress adopts a new law against the backdrop of a 'longstanding administrative [or judicial] construction,' [courts] generally presume[] the new provision should be understood to work in harmony with what has come before." *Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) (quoting *Haig v. Agee*, 453 U.S. 280, 298 (1981)); *accord Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 722 (2018) (citations omitted). Here, the backdrop was the Government's longstanding interpretation that § 1225 applied at the border while § 1226 applied to the interior, 62 Fed. Reg. at 10323; the Supreme Court's endorsement of the same in *Jennings*, 583 U.S. at 287–89; and the Supreme Court's holding that the § 1226(c) exceptions do not stand independent from § 1226(a), *Nielsen*, 586 U.S. at 409. The Laken Riley Act did not include language to change any of those holdings or interpretations even though it amended both § 1225 and § 1226. *See* Laken Riley Act §§ 2–3. The Act therefore ratified the understanding and practice that § 1225(b)(2)(A) applies at the border while § 1226(a) applies to the interior. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

## D

Next, we address the Government's statutory purpose argument, a theme running through the entirety of the Government's position.

According to the Government, the purpose of IIRIRA was to correct a gross inequity between noncitizens stopped at the border and those who unlawfully entered the country's interior. That is, IIRIRA aimed to "replace certain aspects of the [] 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. Rep. 104-469, pt. 1 at 225 (1996). Allowing for release on bond in the country's interior, but not at the border, is one such inequity that the Government believes IIRIRA was meant to fix.

While the Government's account is plausible, and many may agree with it as a matter of policy, it finds little purchase as an interpretive aid. All "laws are the product of compromise, and no law pursues its purposes at all costs." *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (citation modified). In this case, the legislative history confirms that IIRIRA was a product of compromise: Congress reported that IIRIRA was meant to replace only "*certain* aspects" of the prior entry-based regime. H.R. Rep. 104-469, pt. 1 at 225 (emphasis added). It is easy to imagine why Congress might not have wanted to extend mandatory detention into the country's interior even as it equalized in other ways the treatment between noncitizens stopped at the border and those who entered unlawfully.

41

Possibly Congress was worried that there were insufficient resources to detain all noncitizens unlawfully present in the interior. Maybe it thought that, even if there were sufficient resources, humanitarian reasons counseled against such detention since noncitizens in the interior had likely established intimate connections with their friends, neighbors, and communities. Congress may simply have concluded that detention in the interior wasn't necessary: the usual purpose of civil immigration detention is to prevent noncitizens from absconding to avoid removal, but those with strong connections to the community are less likely to do so. Or Congress may have had constitutional concerns because due process protections are far stronger for noncitizens inside the country than at the border. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953).

Perhaps some of these reasons motivated Congress. Perhaps none did. It is impossible to tell and beside the point. What matters is that the seemingly straightforward legislative tale of equalizing treatment between arriving and unlawfully entered noncitizens is much more nuanced and complex than the Government would have us all believe.

In any case, the role of the court is not to impose its views of optimal immigration policy. Its job is simply to apply the law as written. In other words, "we will not presume with [the Government] that any result consistent with [its] account of the statute's overarching goal must be the

42

law but will presume more modestly instead 'that [the] legislature says . . . what it means and means . . . what it says.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (third alteration in original) (quoting *Dodd v. United States,* 545 U.S. 353, 357 (2005)). Because "purposive argument [] cannot overcome the force of the plain text," we reject the Government's position that statutory purpose requires us to extend § 1225(b)(2)(A)'s mandatory detention to noncitizens arrested in the country's interior. *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 460 (2012).

## E

Although the text and context discussed above are sufficient to answer the interpretive question in this appeal, we close with a brief discussion on the doctrine of constitutional avoidance, which further supports our conclusion. Constitutional avoidance, in its strongest form, counsels us against interpreting statutes in ways that raise serious constitutional concerns. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). The mandatory detention of potentially millions of noncitizens without the potential for bond raises exactly such serious concerns.

The Due Process Clause of the Constitution forbids the Government from "depriv[ing]" any "person . . . of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at

43

the heart of the liberty that [this] Clause protects." *Zadvydas*, 533 U.S. at 690. Due process requires that, whenever the Government detains somebody, it must have a good reason for doing so. *Id.* If the detention is civil and nonpunitive, like the immigration detention here, that reason must rise to the level of a "strong special justification." *Id.* Adopting the Government's interpretation of § 1225(b)(2)(A) would pose grave constitutional problems because there is little justification, let alone a strong one, for detaining every one of the millions of unadmitted noncitizens in our country.[12]

We acknowledge that immigration is a unique area when it comes to due process. In *Demore v. Kim*, the Supreme Court held that the Government has significant leeway when it comes to immigration detention. *See* 538 U.S. 510 (2003). The Court explained, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)). The Court also

---

[12] To the extent it matters, we assume for sake of argument that questions about the types of justifications capable of supporting detention sound in substantive due process, while questions about procedures used for proving the satisfaction of a given justification sound in procedural due process. In that regard, our discussion of constitutional avoidance sounds in substantive due process.

44

"recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Id.* at 523.

But the Supreme Court has never said that due process protections fall away completely in the immigration context. Quite the opposite. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). Likewise, the Court did not hold in *Demore* that detention for its own sake is constitutional just because detention occurs during removal proceedings. At most, *Demore* stands for the proposition that *individualized* findings are not always necessary to justify detention in the immigration context, and that *categorical* findings may sometimes be sufficient.

In *Demore*, the Court held that categorical, legislative findings were sufficient to justify mandatory detention under § 1226(c). In sustaining the provision's constitutionality, the Court relied on Congress's extensive findings that it was necessary to mandate the detention of certain removable noncitizens who had been convicted of crimes. *Demore*, 538 U.S. at 518–20, 528. The Court observed that when enacting § 1226(c), Congress relied on studies showing some convicted noncitizens posed a potential danger to society due to high recidivism risk, and that allowing bond "would lead to an unacceptable rate of flight." *Id.* at 518, 520.

45

The precedents that *Demore* cited to justify across-the-board detention also involved categorical determinations that such detention was necessary. For instance, it cited to *Carlson v. Landon*, 342 U.S. 524 (1952), which dealt with mandatory detention of noncitizens who had participated in Communist activities. *See Demore*, 538 U.S. at 523. Various noncitizens argued that they should be released if they could show they were not flight risks, but the Court rejected that argument on the basis of legislative findings, what the Court referred to as "Congress' understanding of [Communists'] attitude toward the use of force and violence." *Carlson*, 342 U.S. at 541. Put differently, it satisfied due process for Congress to make a finding that Communists as a category were "a menace to the security of the United States." *Id.* Similarly, *Demore* cited to *Reno v. Flores*. *See Demore*, 538 U.S. at 526. And in *Reno*, the Court ratified the use of "blanket presumption[s]," and "generic rules" based on those presumptions, to justify immigration detention. 507 U.S. at 313 (internal quotation marks omitted).

In both cases, the Government provided some justification for detention, albeit on a categorical or class-wide basis. No such class-wide findings exist here that would justify mandatory detention of every single unadmitted noncitizen.

All that said, this court need not and does not determine in this case whether the Government's position is unconstitutional. The doctrine of constitutional avoidance instructs us to avoid the Government's interpretation so long as it raises serious constitutional questions, and that it does. Thus, constitutional avoidance is another reason to limit § 1225(b)(2)(A) to the border.

## IV

We conclude by recognizing again the stakes of this dispute over statutory interpretation. In our circuit, thousands of noncitizens are likely subject to mandatory detention under the Government's newfound statutory reading and policy. Many more legal battles over this policy are currently playing out in courts across the country. Five circuits have already weighed in. Ultimately, only one court, the Supreme Court, can settle this issue once and for all.

But in this case and for this circuit, we are tasked with deciding whether this petitioner, Santillan Quiroz, must continue to be detained without even a bond hearing. He need not.

REVERSED AND REMANDED.[13]

---

[13] On remand once the mandate issues, the district court must grant Santillan Quiroz's petition forthwith. Because Santillan Quiroz can properly be subject to detention under § 1226(a), though, the district court shall order the Government to, within seven days of such order, either provide him with a bond hearing or else release him. *See* Aplt. App. at 10; *Requejo Roman v. Castro*, 816 F. Supp. 3d 1267, 1285 (D.N.M. 2026).

Any petition for rehearing is due within fourteen days after judgment is entered by this court.